Rachel M. Fazio, Esq. SB # 187580
John Muir Project
P.O. Box 697
Cedar Ridge, CA 95924
Tel:     (530) 273-9290
Fax:     (530) 273-9260


Attorney for Plaintiffs


IN THE UNITED STATES DISTRICT COURT FOR
THE EASTERN DISTRICT OF CALIFORNIA
AT SACRAMENTO


| | |
|---|---|
| EARTH ISLAND INSTITUTE, a California non-profit, and CENTER FOR BIOLOGICAL DIVERISITY, a non-profit corporation <br> Plaintiffs, <br><br> vs. <br><br> UNITED STATES FOREST SERVICE, DALE BOSWORTH, in his official capacity as Chief of the United States Forest Service, and JOHN BERRY, in his capacity as Forest Supervisor for Eldorado National Forest <br> Defendants, | Case No.: 05 cv 1608 FCD-JFM <br><br><br> PLAINTIFFS MOTION AND MEMORANDUM IN SUPPORT OF MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION |

## I.    MOTION

Pursuant to Fed. R. Civ. P. 65 and Civil Local Rule 65-1, Plaintiffs hereby request a Temporary

Restraining Order and Preliminary Injunction. This motion is being filed in the above-captioned

case presided over by Judge Morrison England, and a hearing date has not yet been set. On

August 15, 2005, counsel for Plaintiffs successfully notified Attorney Jeff Dillen of the United

States Department of Justice by electronic mail to inform defendants of the filing of this motion. A copy of this motion and all supporting papers were served on Jeff Dillen via electronic mail on August 16, 2005.  Plaintiffs seek an immediate injunction to temporarily suspend the implementation of Defendants' "Power Restoration Project" and "Freds Fire Restoration Project" on the Eldorado National Forest, pending resolution of the merits of this case.  This motion is supported by the Declaration of Monica Bond; the Declaration of Edwin B. Royce, PhD, the Declaration of Jonathan J. Rhodes, the Declaration of Chad Hanson; the Declaration of Rachel M. Fazio and the Memorandum of Points and Authorities below.

## MEMORANDUM OF POINTS AND AUTHORITIES

### INTRODUCTION AND SUMMARY

This action stems from the Forest Service's issuance of Records of Decision on both the Freds and Power logging projects under 36 C.F.R. 215.10 Emergency Situation Determination for economic loss which allows for a project to proceed without benefit of administrative appeal. The issues present in this lawsuit could have been aired to the agency and potentially resolved, thus avoiding litigation, through the administrative process but for the agency's decision to rush forward with these timber sales.  These projects run afoul of the requirements of the National Environmental Policy Act, the National Forest Management Act, the 2004 Framework Record of Decision and the Administrative Procedures Act.

The Freds Fire project area is approximately 4,600 acres and the Power Fire project area is approximately 13,611 acres.  A temporary restraining order is requested because implementation of these projects will result in the logging of over 8,000 acres of forest, including the clearcutting of thousands of acres of exceedingly rare snag forest habitat necessary for the survival of native woodpecker species, such as the Black-backed Three-toed woodpecker, Williamson's sapsucker and the Hairy woodpecker, all of which are Management Indicator Species for the Forest and the Region.  In addition, these projects, through the implementation of inaccurate mortality guidelines and the disregard of information that spotted owls utilize some

Motion and Memo for Temporary Restraining Order and
Preliminary Injunction - 2

Rachel M. Fazio
P.O. Box 697
Cedar Ridge, CA 95924
(530) 273-9290

amount of burned forest, will result in the removal and degradation of hundreds of acres of forest habitat suitable for, and currently being utilized by, California spotted owls for foraging and roosting, as well as the removal of forest habitat elements (e.g., large dead trees) necessary to support spotted owl populations now and in the future when the burned landscape returns to mature forest.   Logging activities will degrade fragile post-fire soils and will eliminate the abundant ground cover which currently exists in these project areas and disrupt naturally regenerating conifer seedlings.

### STATEMENT OF FACTS

The Freds fire salvage project area is located in northern California off of Highway 50 approximately 60 miles east of Sacramento, outside the town of Kyburz on the Placerville Ranger District of the Eldorado National Forest. See Declaration of Rachel M. Fazio ("Fazio Dec.") at Ex. A. The Power Fire salvage project area is also located in northern California off east of the town of Jackson off of Highway 88 on the Amador Ranger District of the Eldorado National Forest.  Fazio Dec. Ex. B.

In October of 2004 two human caused fires of unknown origin burned through portions of private lands, and the Eldorado National Forest.  The Freds fire affected a total of approximately 7,700 acres; 4,600 acres burned on the Eldorado National Forest and 3,100 acres burned on private lands.  *Id.,* Ex. A.  The Power fire affected a total of approximately 16,993 acres, 14,255 acres burned on the Eldorado National Forest and 2,738 acres burned on private lands. *Id.,* Ex. B.

On March 23, 2005 the Eldorado National Forest completed draft EISs for the Freds Fire Restoration Project and the Power Restoration Project.  Public comments on the DEISs were due by May 9, 2005.  The DEISs contained no 2005 (post-fire) surveys for sensitive species and no Biological Evaluation.  The entirety of analyses conducted by the Forest Service and provided to the public for comment was prepared while the project area was covered with snow.

On June 16, 2005 Forest Supervisor John Berry requested Emergency Determinations to allow for the timber sales to proceed prior to the resolution of any administrative appeals, to avoid economic loss from deteriorating timber.  Fazio Dec. Ex. C.

Rachel M. Fazio
P.O. Box 697
Cedar Ridge, CA 95924
(530) 273-9290

The Final EISs for the Freds and Power projects were issued on July 1, 2005.  Fazio Dec. Ex. D (excerpts from Freds FEIS) and E (Excerpts from Power FEIS).  An Emergency Determination was granted for both projects by the Chief of the U.S. Forest Service on July 25, 2005.  *Id.,* Ex. C.

On August 1, 2005 the Record of Decision was issued for the Freds project The Decision chose alternative 1 which proposes to salvage log all dead trees as well as trees that are predicted to die over 2,936 acres of burned forest.  The majority of this acreage would be clearcut, leaving no trees remaining on the landscape after the logging occurs.  Fazio Dec., Ex. A.   On August 1, 2005 the Record of Decision was issued for the Power project, choosing Alternative 4, which would allow the salvage logging of 5,574 acres of burned forest.  Dead trees and trees predicted to die, of all sizes, will be clearcut from the landscape. *Id.,* Ex. B.

Both the Freds and Power projects are governed by the Eldorado National Forest Plan, as amended by the 2001 Sierra Nevada Forest Plan Amendment ("2001 Framework") and the Framework Supplemental EIS and ROD issued in 2004 ("2004 Framework"), as well as the 1982 National Forest Management Act Regulations, which include 36 C.F.R. §§219.12(d), 219.19 and 219.26.

### MORTALITY GUIDELINES

Both the Freds and Power projects allow for the removal of current dead trees, and trees that are predicted to die from their fire related injuries. Fazio Dec. Ex. F (Freds mortality guidelines) and Ex. G (Power mortality guidelines).   The projects have established different guidelines for the different tree species found in the project area. *Id.*   In addition, they have established different guidelines for the different logging prescriptions, tractor logging versus helicopter logging.  *Id.*  Some of the guidelines are scientifically accurate and track with the data utilized to support them, for example the guidelines for incense cedar.  However several of the guidelines adopted by these projects are not accurate and do not comport with the data relied upon for their design.

This inaccuracy has led to an overestimation of "dead" trees in the project area, an underestimation of the amount of suitable spotted owl habitat in the project area and a failure to

Rachel M. Fazio
P.O. Box 697
Cedar Ridge, CA 95924
(530) 273-9290

analyze the impacts of removing a significant number of live green trees, that will survive their fire related injuries, from the project areas, when these trees would be instrumental in naturally "restoring" the burned area.

### CALIFORNIA SPOTTED OWL

Both prior to, and after, the Freds and Power fires there existed in the project areas significant portions of habitat that was suitable for the California spotted owl. In the Freds project area there were three historic owl protected activity centers ("PACs") (300 acres of the best owl habitat surrounding a known nest tree) and in the Power project area there were nine. Surveys conducted in 2004, before the fires burned, indicated that no owls were present in the Freds project area, but six of the nine PACs in the Power project area were occupied by owls.

The fires burned after the end of owl nesting season (which runs from March through August) in October of 2004. The Forest Service prepared its environmental documentation for the Freds and Power projects during the winter of 2004-2005.

After the fires the Forest Service redrew the historic PACs in each project area to encompass what they believed was the best remaining 300 acres. Within the redrawn PACs the Forest Service designated the "core area" of the PAC and the "non-core area" of the PAC. They then proposed projects which would allow salvage logging of the historic PACs, the spotted owl home range core areas ("HRCAs" -administratively designated 700 acres) or foraging grounds surrounding the PACs, as well as the non-core areas of the newly designated PACs.

The Draft EIS for both projects were issued in March of 2005. Comments from the public were due by May 9, 2005. No Biological Evaluation was circulated with either DEIS. No surveys for owls had been conducted prior to the issuance of the DEISs.

After the close of public comment and prior to the issuance of the Final EIS for each project owl surveys were begun. At the time the Power FEIS was released on July 1, 2005, four of the nine owl PACs had been surveyed, and two of these four owl PACs were occupied. This information was included in the FEIS, but no sufficient analysis of the impacts to these owls from the proposed logging project was prepared. By August 4 of 2005 all of the PACs in the Power project area had completed, or nearly completed, surveys, finding that seven of the nine

Rachel M. Fazio
P.O. Box 697
Cedar Ridge, CA 95924
(530) 273-9290

PACs were occupied.

With regard to the Freds project area, in a revised Biological Evaluation issued on June 23, 2005 it was noted that owl surveys had found that one of the historic PACs was occupied. The FEIS, issued on July 1, 2005 contained no information regarding occupancy status of the three historic PACs, nor did it contain any analysis on the impacts to owls residing in the project area from the planned logging activities.

Under the Record of Decisions issued for these projects on August 1, 2005, all of the currently occupied PACs would be salvage logged. For a number of the occupied PACs, nearly all of the 300 acre PAC would be salvaged logged. New and evolving scientific research indicates that spotted owls may actually benefit from and use low, moderate and even severely burned forests for foraging and roosting. *See* Expert Declaration of Monica Bond, including Exhibit B.

Since no owls have been found to be nesting in either project area there is no Limited Operating Period or any other restrictions on logging to provide some minimum protection to the resident owls while logging occurs this summer.

### MANAGEMENT INDICATOR SPECIES

The 2001 Framework ROD requires annual "population monitoring" of certain designated Management Indicator Species (MIS) and Species at Risk (SAR) in all Sierra Nevada national forests. This requirement was adopted in the 2004 Framework ROD. In the 2001 Framework ROD, the Forest Service acknowledged that "[m]any uncertainties exist about the status and fate of [management indicator species] and species at risk. Basic information on distribution, population status and habitat relationships is lacking for most [management indicator species] and species at risk, creating uncertantites about the adequacy of and necessity for various conservation measures . . . Uncertainty exists as to if and how these species can serve this role [as ecosystem indicators], because they have not been tested or validated." This lack of "basic information" has continued through the planning process for the 2004 Framework.

The 2004 Framework as well as the FEIS's for both the Freds and Power projects identify several MIS species, which are highly or closely associated with burned forest ecosystems. The

Rachel M. Fazio
P.O. Box 697
Cedar Ridge, CA 95924
(530) 273-9290

Black-backed three toed woodpecker (a.k.a. Black-backed woodpecker or three-toed woodpecker), the Hairy woodpecker and the Williamsons Sapsucker are three such species which occur or could occur in the project areas.  The Forest Service has not conducted the required population monitoring for these species at either the regional, forest or project level.

The Black-backed woodpecker is highly associated with severely burned forest, i.e., forests wherein 75-100% (typically 90% immediate mortality) of the trees were killed outright by the fire. These birds prefer large numbers of medium and large snags for foraging, and require a burned area (or patch) of at least 30-60 acres or larger.  The length of time they can live and breed in a given burned patch depends on the size of the patch, but is typically for four to six years post-fire.  Currently the population trend for the black-backed woodpecker as well as for the Williamson's sapsucker is unknown.

The Power project set aside roughly 750 acres of burned forest as black-backed woodpecker habitat.  However, many of the patches are too small to be usable by the black-backed woodpecker for an optimal period of time, or at all.

The Freds project set aside about 129 acres of habitat for the black-backed woodpecker, however much of the acreage is actually low to moderate severity burn and is not currently suitable for the black-backed woodpecker.

**SLASH DEBRIS AND GROUND COVER:**

Both the Fred and Power projects assert that slash debris will not be an issue, and that slash debris will be treated such that it will not accumulate to more than 8 tons per acre after logging.

Both the Fred and Power project FEIS's state that there exists very little or no ground cover in either project area.  One of the justifications for the salvage logging is the stated need to increase existing ground cover to 50-60% to prevent erosion.  However, based on actual field survey data from August 11, 2005 ground cover within the project areas generally meets or exceeds 50-60%, even in the severely burned stands. (See Dec. of Jon Rhodes, and attached photos).

Motion and Memo for Temporary Restraining Order and
Preliminary Injunction - 7

Rachel M. Fazio
P.O. Box 697
Cedar Ridge, CA 95924
(530) 273-9290

**Snags:**

The 2004 Framework recommends that, after logging operations in westside mixed conifer and ponderosa pine forests, four of the largest snags (dead trees) per acre should be left on the project site. However, both the Freds and Power RODs adopted alternatives that would leave zero snags per acre in all logging units outside of the designated snag patches and the "non-core" areas outside of the spotted owl PACs.

**Logging Operations:**

The Freds project was split into two timber sales. The Freds Fire Salvage and the Pebbles Fire Salvage. Advertisement for the Freds Fire Salvage was published in the Mountain Democrat on July 18, 2005 – two weeks prior to the issuance of the Record of Decision. The bid opening for this timber sale was August 1, 2005. The sale was awarded to Sierra Pacific Industries, and logging began on August 5, 2005 and is currently ongoing. The second timber sale (Pebbles timber salvage sale) was advertised on July 27, 2005, five days before the issuance of the Record of Decision, with a bid opening scheduled for August 10, 2005. No bids were received on this project and it is unknown when it will be re-advertised. Fazio Dec. Ex. L.

The Power project was split into six timber sales, the East Panther Salvage, Camp Fire Salvage, Ellis East Fire Salvage, Bear River Fire Salvage, Rocky Knob Fire Salvage, and Cole Creek Fire Salvage. Advertisement for the East Panther salvage timber sale was published in the Mountain Democrat on July 25, 2005 – one week prior to the issuance of the Record of Decision. The bid opening and award date for this timber sale was August 8, 2005. This sale was awarded on August 9, 2005, and logging on this sale began on or about August 11, 2005 and is ongoing. The other five timber sales will be awarded throughout the month of August (the Camp Timber Sale set to be awarded August 17, 2005 with operations anticipated by August 22, 2005) with the anticipation that operations would be under way on all sales (if awarded) by September 6, 2005. Fazio Dec. Ex. L.

Motion and Memo for Temporary Restraining Order and
Preliminary Injunction - 8

Rachel M. Fazio
P.O. Box 697
Cedar Ridge, CA 95924
(530) 273-9290

## STANDARD OF REVIEW

Plaintiffs are entitled to a temporary restraining order if plaintiffs will suffer "immediate and irreparable injury." Fed.R.Civ.P. 65(b).

The Ninth Circuit employs a two-pronged test in assessing the propriety of a preliminary injunction. To be entitled to preliminary injunctive relief, a plaintiff must demonstrate either a combination of probable success on the merits and the possibility of irreparable injury, or that serious questions are raised and the balance of hardships tips in its favor. These two formulations represent two points on a sliding scale in which the degree of irreparable harm increases as the probability of success decreases. *Idaho Sporting Congress, Inc. v. Alexander*, 222 F.3d at 565 (citations and internal quotations omitted). The same standard governs temporary restraining orders. *Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.*, 240 F.3d 832, 839 n.7 (9th Cir. 2001).

The traditional tests for injunctive relief have been modified in environmental cases. Environmental suits involve the public interest, and therefore, "where the balance of hardships tips decidedly toward the plaintiff, the district court need not require a robust showing of likelihood of success on the merits, and may grant preliminary injunctive relief if the plaintiff's moving papers raise 'serious questions' on the merits." *Caribbean Marine Services v. Baldridge*, 844 F.2d 668, 674 (9th Cir. 198). "Serious questions" are those "questions which cannot be resolved one way or the other at the hearing on the injunction . . ." *Republic of the Phillipines v. Marcos*, 862 F.2d 1355, 1362 (9th Cir. 1988). Serious questions are "substantial, difficult and doubtful" enough to require more considered investigation. Id. Such questions need not show a certainty of success, nor even demonstrate a probability of success, but rather "must involve a 'fair chance of success on the merits.'" *Id.*, quoting *National Wildlife Federation v. Coston*, 773 F.2d 1513, 1517 (9th Cir. 1985).

Motion and Memo for Temporary Restraining Order and
Preliminary Injunction - 9

Rachel M. Fazio
P.O. Box 697
Cedar Ridge, CA 95924
(530) 273-9290

## ARGUMENT

I.    **PLAINTIFFS HAVE DEMONSTRATED A PROBABLE SUCCESS ON THE MERITS AND HAVE RAISED SERIOUS QUESTIONS WITH REGARD TO THEIR CLAIMS:**

A.    **The Forest Service has Violated the Sierra Nevada Framework and the Eldorado National Forest Plan as Amended by the Framework by Failing to Conduct Population Inventories for Management Indicator Species.**

In January 2001, the Sierra Nevada Forest Plan Amendment (commonly called "the Framework") was signed.  The Framework provided guidance for management of eleven Sierra Nevada national forests in California and Nevada, including the Eldorado National Forest.  U.S. Forest Service, Sierra Nevada Forest Plan Amendment Record of Decision (Jan. 2001) (hereafter "2001 Framework ROD").  The 2001 Framework identified Management Indicator Species for which annual population monitoring was required.  (Appedix E of 2001 Framework, excerpts at Fazio Dec. Ex. J).  In January of 2004 the Forest Service revised the 2001 Framework, issuing an amended Framework Supplemental EIS and ROD. ("2004 Framework SFEIS" and "2004 Framework ROD").  The 2004 Framework ROD explicitly adopted the population monitoring requirements of the 2001 Framework, Appendix E.  Fazio Dec. Ex. K, (2004 Framework ROD, Appendix A).

Under the National Forest Management Act, timber sales, logging and related activities, and the permits, contracts and other instruments associated with them, must be consistent with the Land and Resource Management Plan applicable to that particular national forest.  16 U.S.C. § 1604(i); 36 C.F.R. § 219.10(e).  The Sierra Nevada Framework, both 2001 and 2004, were amendments to the Eldorado National Forest Land and Resource Management Plan.  As such, the Forest Service violated 16 U.S.C. § 1604(i) and 36 C.F.R. § 219.10(e) by failing to comply with the requirements of the Framework for population monitoring of species known as Management Indicator (MIS), such as the Hairy woodpecker and the Williamson's sapsucker.

Motion and Memo for Temporary Restraining Order and
Preliminary Injunction - 10

Rachel M. Fazio
P.O. Box 697
Cedar Ridge, CA 95924
(530) 273-9290

1            1)        FRAMEWORK VIOLATIONS

2                      a.        **Management Indicator Species**

3        The 2001 Framework FEIS Monitoring Plan (Appendix E) requires population

4   monitoring and trend data for the MIS Fazio Dec. Ex. J (2001 Framework FEIS, App. E, p. 18)..

5   Specifically, annual population monitoring to determine the changes in distribution is required.

6   *Id.*, p. 64, Table E-9, and p. 19.  However, the required monitoring and quantitative data are

7   lacking for the Hairy woodpecker and Williamson's sapsucker, MIS that would be affected by

8   the Power and Fred's salvage logging projects.  The Forest Service's failure in this regard is a

9   violation of the 2001 Framework, 2004 Framework and a violation of NFMA.  *Sierra Club v.*

10  *Eubanks*, 335 F.Supp.2d 1070, 1081-82 (E.D. Cal. 2004).

11       The 2001 Framework identifies numerous MIS applicable to the Eldorado National

12  Forest, and clearly indicates whether there must be "population inventories" for those MIS.  At

13  Ex. J attached to the Fazio Declaration are pages from the Framework that list the MIS and for

14  each provide a check mark under the heading "population inventory" to indicate whether there

15  must be inventories for them.  In the Framework's words:  "Checkmarks in the population

16  monitoring column indicate species for which population trend data is expected to be obtained."

17  Ex. J, p. E-64, 76 and 98. Furthermore, the population inventory requirement is for "annual

18  monitoring."  *Id.,* at E-63, 96. [1]

19       The species that are "checked" include the Hairy woodpecker and Williamson's

20  sapsucker, which the Power and Fred's EISs identify as species that may be affected by the

21  project or disturbed during project implementation.  Fazio Dec. Ex. E, (Power EIS, pp. 196-197),

22  *Id.,* Ex. D (Freds EIS p. 216).  In response to Plaintiffs comments regarding the lack of Forest

23  Service population monitoring data for these species the Forest Service claims that they do have

24  population data for the Hairy woodpecker, citing data from the Breeding Bird Survey (BBS)

25

26  _____

27  [1]  The Framework requires monitoring for MIS in the Eldorado National Forest, since it is an
28  amendment to the Forest Plan for the Eldorado National Forest.  MIS are designated at the forest
    level because their, "population changes are believed to indicate the effects of management
    activities" in that forest.  36 C.F.R. § 219.19(a)(1).

Motion and Memo for Temporary Restraining Order and                    Rachel M. Fazio
Preliminary Injunction - 11                                            P.O. Box 697
                                                                   Cedar Ridge, CA 95924
                                                                       (530) 273-9290

which indicates that the species is declining.  Fazio Dec. Ex. E (Power FEIS, pp. 198 (Table 3-53), 522) and Ex. D (Freds FEIS, pp. 217 (Table 3-54), 387-88).

However, there currently exists no population trend data for the Williamson's sapsucker. Fazio Dec. Ex. E and D (Power FEIS, p. 198, Table 3-53 and Freds EIS, p. 217 (Williamson's sapsucker **:  population trend unknown)**.)  In addition, reliance on the Breeding Bird Survey data does nothing to discharge the Forest Service's obligations under the Framework.  The BBS is an independent agency not run by the Forest Service, not charged with managing the national forest system, nor bound to ensure the viability of native vertebrate species.  The 2001 Framework, and therefore the 2004 Framework, requires that the Forest Service gather annual population monitoring data for MIS.  *Sierra Club v. Eubanks*, at 1081-1082;  Fazio Dec. Ex. J (2001 Framework, pp. E-16 ("**we** commit to monitoring each MIS . . ."); E-63 (annual monitoring, through a "dedicated" program, required).)  Indeed, a specific system, including 2800 monitoring "grid points" across the Sierra Nevada, was established **by the Forest Service** for this very purpose.  *Id.,* 2001 Framework, E-21).

Finally, the 2001 Framework indicates in numerous places that there is an absence of population inventories for MIS.  It states:  "Many uncertainties exist about the status and fate of MIS and species at risk.  Basic information on distribution, population status, and habitat relationships is lacking for most MIS and species at risk, creating uncertainties about the adequacy and effectiveness of various conservation measures."  Fazio Dec. Ex. J at E-62, 74, 96.

2)     THE FRAMEWORK MONITORING REQUIREMENTS ARE MANDATORY.

There is no genuine issue that the Framework requires actual population inventories for the MIS.  The case of Sierra Club v. Martin, 168 F.3d 1 (11th Cir. 1999) is directly on point. There, the Forest Plan also had the "population inventory" requirement.  168 F.3d at 3.  Just like the instant case, the Forest Service argued it did not have to have gather such data under the Forest Plan, provided it had "habitat information" on the species, and that it had discretion to rely on information other than its own population inventories.  Id. at 4.  The court held:

[T]he Forest Service cannot ignore the requirements of the Forest Plan . . . .  Since

Rachel M. Fazio
P.O. Box 697
Cedar Ridge, CA 95924
(530) 273-9290

the agency's position is contrary to the clear language of the Plan and the statute,
it is not entitled to deference. We consequently hold that the Forest Service's
failure to gather population inventory data on the [covered] species . . . is contrary
to the Forest Plan, and therefore, that the decision to approve the timber sales
without considering this information is arbitrary and capricious. 168 F.3d at 5.

**B.      The Forest Service has Violated the National Forest Management Act Regulation Requirements for Monitoring Management Indicator Species**

Forest plans must designate Management Indicator Species (MIS) whose "population changes are believed to indicate the effects of management activities." 36 C.F.R. 219.19(a)(1). They are "proxies used to measure the effects of management strategies on Forest diversity." Sierra Club v. Martin, 168 F.3d at 7.

The Defendants have failed to collect necessary monitoring data for the Eldorado National Forest and the Power and Freds Project as required by National Forest Management Act (NFMA) and NFMA's implementing regulations. Specifically, 36 C.F.R. §219.12(d) requires that "each Forest Supervisor shall obtain and keep current inventory data appropriate for planning and managing the resources under his or her administrative jurisdiction." 36 C.F.R. § 219.19 requires the Forest Service to monitor the population trends of MIS and the relationship of MIS to habitat changes. 36 C.F.R. § 219.26 requires the Forest Service to gather and keep "quantitative data" for MIS. 36 C.F.R. § 219.26 also requires the Forest Service to use "quantitative data" to assess the Forest Plan's effects on diversity. These requirements are found in the 1982 version of the NFMA regulations. Though these regulations were recently supplanted by a new set of regulations, the 1982 NFMA regulations, described supra, still govern activities undertaken pursuant to the 2004 Framework forest plan since these regulations were in place at the time the 2004 Framework plan was approved. *NRDC v. Forest Service*, 2005 U.S. App. Lexis 16194, see n. 3 (9th Cir. 2005, decided August 5, 2005); *see also* Fazio Dec. Ex. J (2004 Framework FEIS, pp. 187-88 (incorporating the 1982 NFMA regulations)); *Id.*, (2004 Framework ROD, pp. 20-21 (same)); *Id.*, Ex. M (Power Wildlife Biological Evaluation, p. 2.; Freds MIS report p. 1 (same)).

Rachel M. Fazio
P.O. Box 697
Cedar Ridge, CA 95924
(530) 273-9290

1          1)    <u>LACK OF POPULATION TREND DATA.</u>

36 C.F.R. § 219.19(a)(2) states: "Planning alternatives shall be stated and evaluated in terms of both amount and quality of habitat and of animal population trends of the management indicator species."  However, the Forest Service's Environmental Impact Statements for the Power and Freds Projects list the Black-backed Three-toed woodpecker, which is an MIS species (2004 Framework FEIS, p. 168 – referred to as the "Three-toed woodpecker", Fazio Dec. Ex. K) as a species that may be affected by the projects or disturbed during project implementation, and that, in the words of the EIS, are population trend "unknown."  Fazio Dec. Ex. E (Power FEIS, p. 198); *Id.*, Ex. D (Table 3-53; Freds FEIS, p. 217, Table 3-54).  The same is true for the Williamson's sapsucker. *Id.*

           2)    <u>LACK OF QUANTITATIVE DATA.</u>

36 C.F.R. § 219.26 requires the Forest Service to gather and keep "quantitative data" for MIS.  That regulation states: "Inventories shall include quantitative data making possible the evaluation of diversity in terms of its prior and present condition."  This regulations "creates a general obligation that the Forest Service gather and keep data to ensure species diversity in the planning area."  <u>Sierra Club v. Martin</u>, 168 F.3d at 5.  As established in the section above on violations of the Framework population inventory requirements, the Power and Freds FEISs demonstrate a lack of "quantitative data" for these MIS. There simply is no inventory information for them.  Therefore, the Power and Freds Projects violate the regulations, are arbitrary and capricious, and must be set aside under the APA, 5 U.S.C. § 706(2)(A);  <u>Martin</u>, 168 F.3d at 6-7.

           3)    <u>ERRONEOUS RELIANCE ON HABITAT AS PROXY.</u>

In this case, the Forest Service's use of a habitat analysis in lieu of MIS trend data, i.e. its "proxy on proxy" approach for these MIS species (see e.g., Fazio Dec. Ex. E (Power FEIS, pp. 244-49); *Id.,* Ex. D, (Freds FEIS, pp. 274-81), does not meet the requirements of 36 C.F.R. § 219.19.  While under <u>Inland Empire</u>, 88 F.3d at 761, the court held that the Forest Service could forego the MIS trend data requirement of 36 C.F.R. § 219.19 if it ensured that the project area contained enough habitat essential for survival of the species, the Ninth Circuit has held that

Rachel M. Fazio
P.O. Box 697
Cedar Ridge, CA 95924
(530) 273-9290

where there is a lack of underlying population trend data, <u>Inland</u> does not apply.  <u>Idaho Sporting</u>

<u>Congress, Inc. v. Rittenhouse</u>, 305 F.3d 957, 971-72 (9th Cir. 2002).

There is no genuine issue that the Forest Service lacks the underlying data needed to

support a habitat analysis in lieu of population trend data for the Black-backed Three-toed

woodpecker or the Williamson's sapsucker.  In fact the Forest Service's declaration that

population trends for these species are "unknown", supports Plaintiffs assertion that the

Forest Service simply does not know if the viability of these species is being ensured or what the

actual impacts of this project will be on these two species.

Under these circumstances, the Forest Service is violating the NFMA regulations.  *Utah*

*Environmental Congress*, 190 F.Supp. 2d at 1270 (lack of data since 1991 held insufficient to

support habitat analysis).  There is no MIS data here for these two MIS species (Black-backed

Three-toed woodpecker and the Williamson's sapsucker) in the project area (or that use the

project area) and that will be effected by the logging.  The Forest Service lacks the necessary

underlying information to support using a habitat analysis in lieu of actual population studies for

MIS, and, moreover, it admittedly lacks the "quantitative data" required by 36 C.F.R. § 219.26;

*Sierra Club v. Eubanks*, at 1081-82.

**C.**     **The Power and Fred's FEISs violate NEPA's requirement to ensure scientific**
**accuracy and integrity.**

NEPA requires agencies to "insure the professional integrity, including scientific integrity, of

the discussions and analyses in environmental impacts statements."  40 CFR 1502.24

("Methodology and scientific accuracy"); *see also Earth Island Institute v. United States Forest*

*Service*, 351 F.3d 1291, 1301-1302 (9th Cir. 2003).

1.     UNDERLYING MORTALITY GUIDELINES IN THE POWER AND FRED'S FEISS ARE
INACCURATE FOR YELLOW PINE (PONDEROSA AND JEFFREY PINE
COMBINED) AND WHITE FIR.

The Power and Freds FEISs allow the removal of dead trees, as well as trees predicted to

die according to post-fire mortality guidelines, which the Forest Service states are based upon the

Rachel M. Fazio
P.O. Box 697
Cedar Ridge, CA 95924
(530) 273-9290

publication Hood et al. (2005).  Fazio Dec., Ex. N (excerpts of Hood et al study); Ex. E  (Power FEIS, pp. 75-77); and Ex. D (Freds FEIS, pp. 59-61).  The Power FEIS states that the mortality model is based upon only one factor: crown length scorch (the portion of the length of the pre-fire green crown that has been scorched brown by fire).  For yellow pine and white fir over 20 inches in diameter on helicopter and skyline logging units, which represent about 54% of the acreage planned for logging (Power FEIS, pp. 35-36 (Fazio Dec. Ex. E), trees can be called "dead", and be salvage logged, if they have 65% crown scorch (i.e., the upper 35% of the crown remaining green and alive).  *Id.,* (Power FEIS, p. 76, Table 3.5).  The Power FEIS claims that **87%** of white fir and **90%** of yellow pine die at 65% crown scorch, claiming to rely upon the data and models in Hood et al (2005) for this determination.  *Id.*, (Power FEIS, p. 77, Table 3.6 ). Yet the Hood et al (2005) report asserts that, for the model using only crown scorch (model 3 (dashed line)), only **45%** of white fir will die (Fazio Dec., Ex. N (Hood et al 2005, p. 15, Table 5 (for white fir)), and only **68%** of yellow pine will die (*Id.,* Hood et al 2005, Table 11).  Even in tractor logging units, where white fir over 20 inches in diameter can be called "dead" for logging purposes if they have 80% crown scorch (Fazio Dec. Ex. E (Power FEIS, p. 76, Table 3.5)), the FEIS claims that **95%** of trees at this scorch level will die (*Id.,* Power FEIS, p. 77, Table 3.6), while the Hood et al. (2005) data says only **77%** will die.  Royce Declaration, ¶¶ 28-29, Table 3; Fazio Dec., Ex. N (Hood et al 2005, p. 15, Table 5 (for white fir)).

Dr. Edwin Royce, a expert botanist who studies post-fire conifer survival (Royce Declaration, ¶¶ 1-7), obtained the data and model formulas from the authors of Hood et al (2005), and determined that these substantial inaccuracies unequivocally exist between the chosen mortality guidelines and the data which the Forest Service has used to justify their

Rachel M. Fazio
P.O. Box 697
Cedar Ridge, CA 95924
(530) 273-9290

guidelines for white fir and ponderosa pine.  Royce Declaration, ¶¶ 18-30.  Both ponderosa pine and white fir are highly common in the Power project area.

As Dr. Royce points out, the inaccuracy for yellow pine is likely to be even greater than reported above, due to errors in data collection in the Hood et al. (2005) study, which overestimated mortality for yellow pine.  Royce Declaration, ¶¶ 22-24.

The Fred's FEIS states that the mortality model used for that project was based upon two factors, crown scorch and whether bark beetle attack has occurred for a given tree.  Fazio Dec. Ex. D (Fred's FEIS, p. 59).  It is unclear whether this is a misprint, given that the mortality guidelines do not take insect activity into account for white fir (*Id.,* Fred's FEIS, pp. 315, 317). Further, the Fred's FEIS states that there was no significant insect activity detected at the time of the FEIS.  *Id.,* (Fred's FEIS, p. 57).  If only crown scorch was intended to be taken into account, as is the case for the Power Fire, then the exact same inaccuracies reported above for the Power fire would apply.  If, on the other hand, both crown scorch and insect activity were intended to be taken into account on the Fred's fire (which would not actually be possible for white fir, since beetle attack is not part of the guidelines, as mentioned above), similar levels of inaccuracy would nevertheless still be present for the Fred's fire, as compared to the Power fire.  Royce Declaration, ¶¶ 18-30.  The greatest inaccuracies in the Freds tree mortality guidelines exist with regard to the helicopter and skyline units, where the guidelines allow mature white fir and yellow pine (greater than 20 inches in diameter) to be removed with only 65% crown scorch.  Given that 72% of the area proposed for logging under the Freds project is within helicopter or skyline units, and that the majority of these trees are white fir and yellow pine, many of the trees identified as "dying" and scheduled to be removed would otherwise live in the Fred's project. Fazio Dec. Ex. D (Fred's FEIS, p. 29).

Rachel M. Fazio
P.O. Box 697
Cedar Ridge, CA 95924
(530) 273-9290

Finally, the Power and Fred's FEISs dismiss decades of published, peer-reviewed scientific literature, which consistently show much lower mortality levels than those claimed by the FEISs and by the Hood et al (2005) report (see Royce Declaration, ¶¶ 22, 30), primarily based upon the assertion that crown length scorch (used by the Power and Fred's mortality guidelines) cannot be compared to crown *volume* scorch (the total amount, or "volume", of green foliage scorch), which is the measure used in the scientific literature.  The FEISs claim, for example, that 65% crown length scorch equates to 88% crown volume scorch, again citing data from Hood et al (2005) and communications with one of the authors of that report, Sheri Smith. Fazio Dec. Ex. E (Power FEIS, p. 75, Table 3-4);  *Id.,* Ex. D (Fred's FEIS, p. 59, Table 3-4). However, Dr. Royce's communication with Ms. Smith revealed that, according to her own data, the crown volume measure does yield a larger scorch value, but only by a few percentage points, not 23 percentage points as claimed by the FEISs.  Royce Declaration, ¶ 16.  Dr. Royce's own data comparing the two measures for mature conifers within the Star fire site found no significant difference between the two measures.  Royce Declaration, ¶¶ 11-17.  The FEISs complete disregard of the strong body of published, peer-reviewed scientific evidence is not reasonable given the fact that it is premised upon yet another inaccuracy.

For the reasons stated above, the Power and Fred's FEISs fail to meet NEPA's requirement to ensure scientific accuracy and integrity with regard to the mortality guidelines since, the mortality levels claimed in the FEISs are directly contradicted by the Forest Service's own data and models—the same data and models which the agency claimed to rely upon, and are contrary to every other peer reviewed scientific study available on this topic.  As discussed infra, this scientific inaccuracy results in a failure to adequately analyze impacts to the California spotted owl and appropriately assess what actions are needed to "restore" these areas.

Rachel M. Fazio
P.O. Box 697
Cedar Ridge, CA 95924
(530) 273-9290

2.  CLAIMS IN THE POWER AND FRED'S FEISS REGARDING LACK OF SOIL COVER, AND CONSEQUENT EROSION POTENTIAL, ARE INACCURATE.

The Power and Fred's FEISs claim that one of the main reasons for these logging projects is to increase soil cover to 50-60% (which they propose to do through the creation of logging slash).  Fazio Dec. Ex. E  (Power FEIS, p. 13); *Id.,* Ex. D (Fred's FEIS, p. 18).  The Power and Fred's FEISs claim that the severely burned areas (75-100% tree mortality) are "void" and "devoid", respectively, of soil cover (including soil organic matter, such as needles, twigs and other forest "litter").  However, these claims were made based upon site visits immediately after the fire, and were reiterated in the Draft EISs, which were issued before spring of 2005.  Whether these claims were ever accurate is unknown, but it is now known that they are flatly inaccurate as of August of 2005.

Jon Rhodes, a veteran hydrologist with decades of professional experience assessing soil cover and erosion potential in forests, including after fire (and who has also published numerous scientific studies on these isssues), visited the Power fire project area on August 11, 2005.  Rhodes Declaration, ¶¶ 1-7.  He conducted detailed soil cover measurements within six severely burned areas, focusing on those areas that were particularly severely burned across the project area.  He also visually assessed additional severely burned sites in the Power project area.  Mr. Rhodes found that effective soil cover consistently exceeded 50-60% on severely burned sites on the Power fire area, usually by a considerable margin.  Rhodes Declaration, ¶¶ 8-15.  The soil cover was comprised by needles, twigs and branches that have fallen since the fire, as well as by new growth of post-fire vegetation.  *Id.*, see attached photos.  Mr. Rhodes concludes that the assertions in the Power FEIS regarding soil cover is clearly inaccurate.  *Id.*

Rachel M. Fazio
P.O. Box 697
Cedar Ridge, CA 95924
(530) 273-9290

Further, Mr. Rhodes reviewed representative photos taken in August of 2005 of current soil cover in severely burned sites within the Fred's fire area and concluded that soil cover clearly exceeds 50-60% in the photos.  Rhodes Declaration, ¶ 16.

Mr. Rhodes concludes that, not only is soil cover in severely burned stands in excess of 50-60%, contrary to claims in the FEISs, but also that planned salvage logging will greatly reduce or eliminate this soil cover and <u>increase</u>, not decrease, <u>erosion</u>.  Rhodes Declaration, ¶¶ 17-33.  Further, he found no evidence of widespread erosion resulting from the particularly heavy winter and spring precipitation, which the Sierra's experienced this year, on the severely burned portions of the Power fire.  Id., ¶ 18.

For the foregoing reasons, the claims made in the Power and Fred's FEISs about the heavily burned areas being devoid of soil cover, and at significant risk of substantial erosion, were demonstrably inaccurate, and fail to meet requirements of NEPA analysis.

3.  <u>THE FEISS' CLAIMS THAT 4 LARGE SNAGS PER ACRE CANNOT BE RETAINED IN MOST SEVERELY BURNED STANDS, DUE TO PROJECTED FUEL LOADS IN 25 YEARS, ARE INACCURATE.</u>

The Records of Decision (ROD) for the Power and Fred's projects state that the alternatives that would have retained a minimum of 4 of the largest snags (dead trees) per acre in the severely burned areas proposed for logging do not meet the purpose and need because there would be hazardous levels of fuels at year 25 post-fire due to these large snags.  Power ROD, p. 5; Fred's FEIS, p. 8. (Fazio Dec. Ex. B and D)  The Power FEIS states, for example, that the retention of 4 large snags per acre in severely burned units proposed for logging would result in well over 38-40 tons per acre of surface fuels by year 25 post-fire, creating a high fire hazard. Power FEIS, pp. 49-50, Table 2-17. (*Id.,* Ex. E)   In the great majority of the Power project area (i.e., outside of the 732 acres of snag retention patches, very small riparian buffers, and spotted

Rachel M. Fazio
P.O. Box 697
Cedar Ridge, CA 95924
(530) 273-9290

owl non-core PACs), 0 snags per acre would be retained for the chosen alternative (Alternative 4).  See map in Power FEIS, p. 39 (see Legend under "Treated Areas") (*Id.*).

The 2004 revised Sierra Nevada Framework forest plan ROD recommends retention of the 4 largest snags per acre (for wildlife habitat) in western Sierra Nevada mixed conifer and ponderosa pine forest types, and the 6 largest snags per acre in red fir forest.  2004 Framework ROD, p. 51. (Fazio Dec. Ex. K)  Nearly all of both the Power and Fred's project areas are in mixed conifer and ponderosa pine forest types (red fir forest generally begins at elevations above the highest point in both project areas).

The Brown et al (2001) study, authored by Forest Service scientists, shows that conifers 30 inches in diameter weigh roughly 3-4 tons per tree.  Brown et al (2001), Table 1 (Fazio Dec. Ex. O).  Using standard tables from the Forest Service, a tree approximately 40 inches in diameter weighs a total of about 6 tons.  See USFS unpublished document, 7/11/03 (*Id.*).  Further, the Brown et al (2003) study from the Forest Service states that large logs over 8-10 inches in diameter are largely irrelevant to the intensity and rate of spread of fire.  Brown et al (2003), Fig. 3, pp. 19-20 (Fazio Dec. Ex. O).  The Power and Fred's FEISs contain identical figures showing the rate at which snags can be expected to fall and decay.  Power FEIS, p. 89; Fred's FEIS, pp. 77-78. (Id., at Ex. E and D) In addition, both FEISs state that, after logging and clean-up of slash debris, there will be no more than 8 tons per acre of surface fuel in the project areas.  Power FEIS, p. 23, Table 2-3; Fred's FEIS, p. 74, Table 3-9. (*Id.*)  There are approximately 5 snags per acre over 40 inches in diameter in the Power fire area (Power FEIS, p. 84, Table 3-13) (Fazio Dec. Ex. E), while there are even fewer large snags in the Fred's fire (Fred's FEIS, p. 71, Table 3-8) (Id., at Ex.D).  Thus, retaining the 4 largest snags per acre in the Power fire would generally result in 4 snags per acre roughly 40 inches in diameter, while

Rachel M. Fazio
P.O. Box 697
Cedar Ridge, CA 95924
(530) 273-9290

retaining the 4 largest snags per acre in the Fred's fire would result in retention of somewhat

smaller snags, on average.

The tables in the FEISs regarding the rate of snag fall show that, on average, only about

1.2 large snags per acre would be expected to fall by year 25 post-fire.  Power FEIS, p. 89.

(Fazio Dec. Ex. E)  This would result in an average range of about 5-10 tons per acre--at most--

given the weight of trees of this size, as discussed above (and leaving aside, for the moment, that

a few large logs do not significantly contribute to fire hazard, as mentioned supra).  In addition,

according to the wood decay rate tables in the FEISs, approximately half of the 8 tons per acre of

surface fuel that will be left after project completion will have decayed by year 25.  Power FEIS,

p. 89; Fred's FEIS, p. 78.  (*Id.*)  Therefore, according to the data and tables in the FEISs

themselves, and standard Forest Service data on tree weight, by year 25 there would not be more

than about 9-14 tons per acre of surface fuels, and most of that would result from a small number

of large logs that the Forest Service's own scientists believe present no real fire hazard.  Brown

et al (2003). (Fazio Dec. Ex. O)  Thus, the analysis in the Power FEIS that there would be 38-40

tons per acre of surface fuel, in areas where the 4 largest snags per acre were retained, is clearly

inaccurate, and fails to meet NEPA's requirements to ensure scientific accuracy and integrity.

Likewise, the statement in the Fred's ROD (Fazio Dec. Ex. 1, p. 8) that hazardous fuel levels will

result by year 25 where 4 large snags per acre are retained, is similarly inaccurate.  These

inaccuracies result in the excessive removal of large dead trees which are critical to the habitat

recovery of the area.  (*See* Bond  Dec.).  In addition, the inaccuracies regarding snag fall rate and

fuel loads for both the Power and Freds FEISs are further exemplified by the fact that the FEIS

for the Star Fire (2002) clearly found that, in severely burned stands of mature forest where 4 of

Rachel M. Fazio
P.O. Box 697
Cedar Ridge, CA 95924
(530) 273-9290

the largest snags were retained, only 7 to 8 tons per acre of surface fuel was projected by year 25 post-fire.  Fazio Dec. Ex. P (Star Fire FEIS, pp. 68-70).

The foregoing analysis applies, at a minimum, to all tractor logging units, which represent 46% of the Power project area (Power FEIS, pp. 35-36) (Fazio Dec. Ex. E) and 28% of the Fred's project area (Fred's FEIS, p. 29) (Id., Ex. D), because multiple entries are expected in these units to remove dead trees over the next several years, such that the only dead woody material that would remain upon project completion (if 4 large snags/acre were retained) would be the 4 largest snags and 8 tons per acre of residual surface fuel.  In addition, the above analysis would apply to helicopter and skyline units (where only one entry is expected) in which there is 100% current tree mortality.  Numerous photos in both FEISs indicate that a number of such stands exist.  *See, e.g.*, Power FEIS, pp. 2, 11 (Fazio Dec. Ex. E).

### D.    The Freds and Power FEISs are Legally Fail to Take a Hard Look at the Impacts this Project will Have on the California Spotted Owl

"NEPA imposes a procedural requirement that an agency must contemplate the environmental impacts of its actions."  Idaho Sporting Congress v. Thomas, 137 F.3d 1146, 1149 (9th Cir. 1998).  A detailed environmental impact statement (EIS) must be prepared for every "major federal action significantly affecting the quality of the human environment."  42 U.S.C. § 4332(C).  Agencies must take a "hard look" at the consequences, environmental impacts, and adverse environmental effects of proposed actions.  See Kleppe v. Sierra Club, 427 U.S. 390, 410 n. 21 (1976).  The FEIS prepared for the Power and Freds Fire logging projects fails to meet the minimum NEPA requirements, and a new or supplemental EIS is therefore required before logging can proceed.  See 40 C.F.R. § 1500.1(b) ("NEPA procedures must insure that environmental information is available to public officials and citizens before decisions are made and before actions are taken.").

Due to the desire of the Forest Service to maximize the amount of money they could make from salvage logging the Power and Freds project areas, they ignored critical information

Rachel M. Fazio
P.O. Box 697
Cedar Ridge, CA 95924
(530) 273-9290

necessary to determine the effects of these projects on the California spotted owl.  First, owls

have returned to both project areas after the fire.  In the Power project 7 of the 9 owl PACs are

occupied, and in the Freds project area at least one of the three PACs is occupied, according to

survey data which was mostly (Power) or entirely (Freds) absent from the FEISs.  Fazio Dec. Ex.

H (Spotted owl Survey Data from Power project area); and Ex. I (field survey info from Freds

project area).  In both project areas, the level of post-fire owl occupancy is greater than the pre-

fire owl occupancy level. Fazio Dec. Ex. E (Power FEIS, p. 186, table 3-45); Ex. D, (Freds FEIS,

p. 202, Table 3-49).

Both FEISs utterly fail to analyze four crucial pieces of information regarding impacts to

spotted owls.  First, the Freds FEIS fails to include any mention of the fact that one of the three

owl PACs was occupied after the fire (Fazio Dec. Ex. D (Freds FEIS, pp. 195-202, 225-228), and

the Power Fire FEIS only included information indicating that 2 of the 9 spotted owl PACs were

occupied.  *Id.,* Ex. E (Power FEIS, p. 185); see also *Id.*, (Power FEIS pp. 184-190, 201-206).

Thus the potential adverse impacts of logging on most of the resident spotted owls remains

unanalyzed.

Second, neither FEIS contains any analysis of a recent study in which spotted owls were

radio-tracked following a fire in southwestern Oregon.  The study found that spotted owls not

only remained in the burned area, but that they spent a significant amount of their time in burned

forest, 6-26% of their time was spent in moderately burned forest and 18-31% of their time was

spent in severely burned forest, indicating use of these areas for roosting and foraging.  Bond

Declaration, ¶19 and Exhibit B.  Instead the FEISs only considered the potential adverse impacts

to owls from the logging in underburned or mildly burned forest stands.  Fazio Dec. Ex.E (Power

FEIS, p. 520); and Ex. D (Freds FEIS, p. 386).  While both FEISs divulged that spotted owls

Rachel M. Fazio
P.O. Box 697
Cedar Ridge, CA 95924
(530) 273-9290

may withstand a certain amount of moderate or high severity fire within their greater territories, neither FEIS considered that the owls might actually **use** and **benefit** from the moderate and high severity patches within their territories, including within their PACs and HRCAs.  Id., Ex. E (Power FEIS, p. 185);and  Ex. D (Freds FEIS, p. 196).  In point of fact, the abundance of dead trees, downed logs, and low vegetation generated in moderately and severely burned areas may increase prey abundance for spotted owls, enchancing foraging opportunities.  Bond Dec. ¶20.

Third, the FEISs state that limited operating periods (LOPs), which prohibit logging within ¼ mile of nest sites during nesting season (March – August), only apply when the actual nest tree has been located and a pair of owls nesting is confirmed.  Fazio Dec. Ex. E  (Power FEIS), p. 521; and Ex. D (Freds FEIS, pp. 386-87); *see also Id.*, Ex. K, 2004 Framework ROD, p. 60 (nesting season lasts until August 31st).  Given that no nesting pair has been observed in either project area, there are no limitations on logging operations. (See survey results Fazio Dec. Ex. H (Power) and Ex.I (Freds)[2].  This is particularly serious given the fact that **salvage logging is allowed within the occupied spotted owl PACs**.  The 300 acre PACs were redrawn after the fire to include the best 300 acres of habitat.  Fazio Dec. Ex. E, (Power EIS) and Ex. D (Freds EIS).  These redrawn PACs were then partitioned into "core" areas and "non-core" areas.  All "non-core" portions of the post-fire PACs can be logged.   Ex. E, (Power FEIS, p. 14); and Ex. D (Freds, FEIS, p. 19).  In fact some occupied PACs, such as PAC AM017 and AM007 in the Power fire area (see Fazio Dec. Ex. H, recent Power owl occupancy data), would have roughly 90% of the PAC logged, since the Forest Service designated very little as "core" PAC area,

_____

[2] The fact that no nesting pairs were found in either site is not symptomatic of the fire.  As Monica Bond testifies, owls reproduction rates are variable (Bond Dec. ¶13.) and this year was the lowest year on record for spotted owls in the Sierra Nevada.  (*Id.*, ¶ 21, footnote 1: personal communication with biologists on the Tahoe/Eldorado owl study site and on Sequoia National Forest.)

Rachel M. Fazio
P.O. Box 697
Cedar Ridge, CA 95924
(530) 273-9290

leaving approximately 30 acres un-logged for the resident owl.  Bond Declaration ¶¶25-26; see also Fazio Dec. Ex. E (Power FEIS maps on p. 28 and 188).  Thus, logging can occur not only within occupied PACs, but actual roosting trees used by single owls and pairs of owls can be logged.  The is nothing in either FEIS to prevent this.  It should also be noted that the "core" and "non-core" areas of these PACs were designated before most of the occupancy locations were determined.  No analysis of logging impacts to current resident owls or of the integrity of the re-drawn PACs and its future for potential use after logging has been analyzed in either EIS.

Finally, as discussed supra, many of the live large ponderosa pine and Jeffrey pine, and most of the live white fir scheduled to be logged would otherwise survive their fire related injuries and would contribute to owl habitat both presently and into the future.  Neither FEIS analyzed the impacts of this on the spotted owl, and merely stand by their assertion that only a small percentage (5-10%) of the trees to be logged could have been useful for the owls habitat needs.  Fazio Dec. Ex. E (Power FEIS, pp. 76-77); and Ex. D (Freds FEIS, pp. 59-61).

## II.    PLAINTIFFS HAVE DEMONSTRATED A LIKELIHOOD OF IRREPARABLE INJURY.

Logging several thousand acres of ecologically critical habitat occupied by spotted owls and MIS species is precisely the kind of irreparable injury that justifies an injunction. As both the Supreme Court and the 9th Circuit Court of Appeals have repeatedly said: "[e]nvironmental injury, by its nature, can seldom be adequately remedied by money damages and is often permanent or at least of long duration, i.e., irreparable." *Idaho Sporting Congress, Inc. v. Alexander*, 222 F.3d at 569 (quoting *Amoco Prod. Co. v. Village of Gambell*, 480 U.S. 531, 545 (1987) (alteration in original)). In this case, the Bond Declaration describes the irreparable harm that this project will have on spotted owls.  Bond Decl. ¶¶19-30.  This harm is serious and immediate given that, as discussed supra, owls use moderately and severely burned forest

Rachel M. Fazio
P.O. Box 697
Cedar Ridge, CA 95924
(530) 273-9290

(contrary to the assumptions in the FEISs), salvage logging is planned in areas currently occupied by spotted owls, including Protected Activity Centers, with no limitation on felling trees, even if they are being utilized by the owls for foraging or roosting, and that through benefit of inaccurate guidelines, a significant number of large live old growth trees, that would otherwise survive their fire related injuries and contribute to habitat for the spotted owl, would be logged.

In addition, the large snags, which will be removed by these logging projects, are one of the most important habitat components in the forest.  First, while the burned landscape is returning to a live forest condition, severely burned forests provide essential foraging and nesting habitat for species such as the Hairy and Black-backed woodpeckers and the Williamson's sapsucker. Fazio Dec. Ex. Q (Article on Black-backed woodpecker). Second, once the forest has transitioned back to a mature green forest, these snags, which can remain standing for decades, provide essential habitat for cavity nesters and perch and prey raptors, such as the California spotted owl.  Even after they fall, the snags (sometimes referred to as legacy trees) continue to provide habitat for numerous prey species, such as voles and mice, and as they decay they return important nutrients to the soil.  Bond Dec. ¶27.

Black-backed and Hairy woodpecker habitat (severely burned forest) would be reduced by about 80% by the Power project (Fazio Dec. Ex. E (Power FEIS, p. 249, Table 3-77)), and in the Freds project approximately 129 acres out of 2, 936 would be retained for these species. (Id., Ex. D (Freds FEIS, p. 30, Table 2-4, note 2).

Once the trees in this ecologically critical area are cut down, there is no putting them back. *See Earth Island Institute v. United States Forest Serv.*, 351 F.3d 1291, 1299 (9th Cir. 2003); *Neighbors of Cuddy Mountain v. United States Forest Serv.*, 137 F.3d 1372, 1382 (9th Cir. 1998) (finding that "[t]he old growth forests plaintiffs seek to protect would, if cut, take hundreds of years to reproduce").  As such a Temporary Restraining Order and Preliminary

Rachel M. Fazio
P.O. Box 697
Cedar Ridge, CA 95924
(530) 273-9290

Injunction should issue to maintain the status quo and eliminate the risk of harm, while the merits of Plaintiffs claims are decided.

### III.    SERIOUS QUESTIONS HAVE BEEN RAISED AND THE BALANCE OF HARMS AND THE PUBLIC INTEREST FAVORS AN INJUNCTION.

Plaintiffs, at a minimum, have raised serious questions about the accuracy of Defendants tree marking guidelines, soil coverage and fuel load estimates which in turn calls into question the adequacy of the analysis prepared for these two projects.

In balancing the harms, the issue is whether the irreparable environmental harm from cutting thousands of trees outweighs any alleged economic harm to the timber company or Forest Service if the logging must be temporarily enjoined.  The environmental harm caused by the logging is considered irreparable, while economic injury is not. *Portland Audubon Society v. Lujan*, 795 F. Supp. 1489, 1509 (D. Or. 1992), aff'd, *Portland Audubon Society v. Babbitt*, 998 F.2d 705 (9th Cir. 1993) ("Courts in this circuit have recognized that timber cutting causes irreparable damage and have enjoined cutting when it occurs without proper observance of NEPA procedures and other environmental laws."); *Pacific Rivers Council v. Thomas*, 30 F.3d 1050, 1057 (9th Cir. 1994) ("timber sales constitute per se irreversible and irretrievable commitments of resources"); *Amoco*, 480 U.S. 531, 545 (1987) ("Environmental injury, by its nature, can seldom be adequately remedied by money damages and is often permanent or at least of long duration, i.e., irreparable.").

As the 9th Circuit has often found, potential monetary damage either to an agency or to a private litigant weighs only lightly, if at all, on the scales of equity in environmental cases. *See, e.g.*, *National Parks & Conservation Association v. Babbitt*, 241 F.3d 722, 738 (9th Cir. 2001) (loss of anticipated revenues to tour boat operator "does not outweigh the potential irreparable damage to the environment"); *Idaho Sporting Congress Inc. v. Alexander*, 222 F.3d at 569

Rachel M. Fazio
P.O. Box 697
Cedar Ridge, CA 95924
(530) 273-9290

(finding that although "a preliminary injunction could present a financial hardship to the Forest Service, the appellee-intervenors, and the communities in and around the [Payette National Forest], this possible financial hardship is outweighed by the fact that '[t]he old growth forests plaintiffs seek to protect would, if cut, take hundreds of years to reproduce'") (quoting *Portland Audubon Soc'y v. Lujan*, 884 F.2d 1233, 1241 (9th Cir. 1989)); *see also Environmental Protection Information Center v. Blackwell*, 2004 WL 2324190 *40 (N.D. Cal. Oct. 13, 2004) (finding that the value of timber to the Forest Service and the economic benefit to surrounding communities are not "unusual circumstances" that warrant denial of an injunction to prevent a timber sale).

Moreover, the public has an interest in preventing Defendants from acting in a manner inconsistent with the applicable law. As the court stated in *Seattle Audubon Society v. Evans,* 771 F. Supp. 1081, 1096 (W.D. Wash. 1991), *aff'd,* 952 F.2d 297 (9th Cir. 1991), "[t]his invokes a public interest of the highest order: the interest in having government officials act in accordance with the law." "Such compliance is especially appropriate in light of the strong public policy expressed in the nation's environmental laws." *Citizen's Alert Regarding Environment v. U.S. Dep't of Justice*, 1995 WL 748246, *11 (D.D.C. 1995) (citing *Fund for Animals v. Espy*, 814 F. Supp. 142, 152 (D.D.C. 1993)): *see Kootenai Tribe of Idaho v. Veneman*, 313 F.3d 1094, 1125 (9th Cir. 2002) (finding that in actions to protect the environment, "the public's interest in preserving precious, unreplenishable resources must be taken into account in balancing the hardships").

Although these projects are billed as "Restoration Projects" the Forest Service's actions have signaled that these sales are all about the money.  This assertion is supported by the Forest Service's decision to implement both projects through an "economic emergency" determination.

Rachel M. Fazio
P.O. Box 697
Cedar Ridge, CA 95924
(530) 273-9290

Fazio Dec. Ex. C (Power & Freds Emergency determination letters).  Both emergency

determinations claimed that the delay that would be caused by allowing administrative appeals

(prior to implementation of projects) would render the timber sales economically non-viable

because most of the logging is helicopter and skyline logging, which is more expensive and sales

supposedly could not be delayed into year two post-fire (2006) due to decay of timber. *Id.*

However, numerous salvage sales occur in years two and three after the fire.  For example the

Star fire timber sales.  The Red Star sales went forward in year two, and even in year three the

Forest Service represented to this Court that the Roadless portion of the timber sale was still

economically viable even though it was also a helicopter sale. *Sierra Club v. Eubanks*, at 1075.

This was after the Forest Service originally represented that if the sales were enjoined the delay

would effectively kill the sale.  Simply put, delay of these timber sales for the purpose of

preparing adequate environmental analysis will not result in the dramatic losses which

Defendants claim.  In point of fact, the Forest Service did not delay in getting these sales out and

already one of the sales (The Pebbles salvage sale) did not receive a bid- indicating that

something other than timber deterioration influences the "viability" of these sales.  In any event,

the public interest is not served by a public agency pushing through inadequate environmental

analysis, prepared over the winter months, without the opportunity for public comment on

essential information, such as the return of spotted owls to the project areas, just to try and

maximize their economic gain.

Claims of the restorative benefits of these projects which would not be allowed to occur

if the projects are enjoined become even more suspect when one looks at the particulars of these

projects.  For example, both the Power and Freds projects plan to log even the largest trees (e.g.,

over 40 inches in diameter) that are the most important to current and future wildlife and the

Rachel M. Fazio
P.O. Box 697
Cedar Ridge, CA 95924
(530) 273-9290

most rare trees on the landscape.  Unfortunately for these trees and the species that rely on them they are also the most valuable, dead or alive.  There is no compelling ecological rationale for logging such trees given their habitat value (Bond Dec. ¶28), the fact that they will generally remain standing for several decades, and the fact that such large trees are not a fire hazard according to the existing science, as this court has previously noted.  *Sierra Club v. Eubanks*, at 1077-78.  The main motivation that the Forest Service seeks to remove these large trees is because of their economic value and the fact that the agency retains much of the money raised from the salvage timber sale receipts for its own budget.

Finally, the Freds fire FEIS shows that the westernmost 20% or so of the fire area burned approximately 700 acres of an area that previously burned in the 1992 Cleveland fire.  Fazio Dec. Ex. D (Freds FEIS, map on p. 66).  This area was salvaged logged and later replanted after the 1992 fire.  The Freds FEIS "Mortality" map shows these 700 acres of plantations on the western 20% of the Freds fire area.  *Id.,* Freds FEIS, map on page 10 (one square mile = 640 acres).  The Freds ROD states that essentially all of these plantation areas ( 694 out of 700 acres) burned at "high intensity".  Id. Ex. D  (Freds ROD, p. 2).  In other words, the last post-fire salvage logging project in the Freds project area did not have the effect of preventing future severe fire.  So why would these two new salvage logging projects, which will ultimately result in new plantations in the areas scheduled for clearcutting have that effect (of reducing "re-burn") in the present case?

Given the economic thrust of these timber sales, the failure of the past similar projects to achieve the goals stated for these current projects, namely prevent severe fire and achieve forest recovery, balance of hard ships tips in favor of plaintiffs and the public interest favors an injunction.

Rachel M. Fazio
P.O. Box 697
Cedar Ridge, CA 95924
(530) 273-9290

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that this Court issue a temporary restraining order and preliminary injunction enjoining any logging or related actions pertaining to the Power and Freds Restoration Projects until a final judgment is entered in this case.

Dated this 16<u>th</u> day of August, 2005.

Respectfully Submitted,

By: ___/s/ Rachel M. Fazio_____
    Rachel M. Fazio
    Attorney for Plaintiffs
    Earth Island Institute and
    Center for Biological
    Diversity

Rachel M. Fazio
P.O. Box 697
Cedar Ridge, CA 95924
(530) 273-9290